UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN MARILLEY, | No. C-11-02418-DMR |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| JOHN MCCAMMAN, *et al*., | |
| Defendants. | |
| _____/ | |

Plaintiff Kevin Marilley seeks a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) enjoining Defendant John McCamman in his official capacity as the Director of the California Department of Fish and Game ("DFG") to hold in escrow, pending decision in this case, all amounts collected by the DFG in nonresident fees for several types of commercial fishing licenses, registrations, and permits. Having read the parties' papers and carefully considered their arguments, evidentiary submissions, and the relevant legal authority, the court finds that this matter is appropriate for determination without oral argument pursuant to Civil Local Rule 7-1(b). The court DENIES the motion for the reasons set forth below.

## I. BACKGROUND

California charges nonresidents higher fees than residents for commercial fishing licenses, registrations, and permits. *See* Cal. Fish & Game Code §§ 7881 (commercial fishing vessel

registrations), 7852 (commercial fishing licenses), 8550.5 (gill net permits), 8280.1 (Dungeness crab vessel permits). The differential fees include:

- Commercial fishing licenses:     $122.75 (residents); $367.75 (non-residents)
- Vessel registration:     $322.25 (residents); $967.50 (non-residents)
- Gill net permits:     $341.75 (residents); $1,290.25 (non-residents)
- Dungeness crab vessels:     $258.25 (residents); $516.00 (non-residents)

(*See* Gross Decl. Ex. B, Sept. 6, 2011.)

On May 18, 2011, Plaintiff filed a complaint against Defendants challenging the constitutionality of California's differential fees under the dormant Commerce Clause, the Privileges and Immunities Clause, the Equal Protection Clause, and 42 U.S.C. § 1983. (*See generally* Compl.)

According to Plaintiff, by October 7, 2011, he and other putative class members must renew their herring gill net permits for the 2012 herring season or be subject to escalating late fees of up to $552.00 per permit. (*See* Gross Decl. Ex. B.) Plaintiff holds three herring gill net permits, and his renewal fees for 2012 will total $3,870.75, compared to $1,025.25 for California residents. (*See* Gross Decl. ¶ 3.) If plaintiff and other putative class members wish to participate as harvesters in one of California's herring fisheries in 2012, they must pay an additional $1,335.25 to renew their nonresident commercial fishing licenses and commercial boat registrations, compared to $445.00 for California residents. Plaintiff's differential fees total $3,735.75. Consequently, Plaintiff moves the court to enjoin the Director of the DFG to hold all differentials collected from nonresidents in escrow until this case is resolved on the merits.

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 25 (2008)). A plaintiff seeking a preliminary injunction must show (1) a likelihood of suffering irreparable harm in the absence of a preliminary injunction, (2) a likelihood of success on the merits, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction would serve the public interest. *Id.* (quoting *Winter*, 555 U.S. at 20). In the Ninth Circuit, courts evaluate these factors on a sliding scale; a court may issue a preliminary injunction

1  on less than a likelihood of success on the merits, if Plaintiff demonstrates "serious questions going
2  to the merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the
3  plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the
4  public interest." *Id.* at 1135 (quotation marks omitted).  In circumstances where the court finds that
5  it cannot yet resolve "doubtful and difficult questions of law or disputed questions of fact," however,
6  a preliminary injunction may not issue.  *See Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir.
7  1973).  Correspondingly, the court's factual findings and legal conclusions when evaluating the
8  merits of a preliminary injunction motion "are not binding at trial on the merits." *Univ. of Tex. v.*
9  *Camenisch*, 451 U.S. 390, 395 (1981).

## III.  DISCUSSION

### A. Likelihood of Success on the Merits or at Least Serious Questions Going the Merits

In order to obtain a preliminary injunction, Plaintiff must establish a likelihood of success on the merits or, at a minimum, that he has raised "serious questions" going to the merits of at least one of his three claims.

#### 1. Commerce Clause

Plaintiff has not demonstrated a likelihood of success on his argument that California's differential commercial fishing fees violate the Commerce Clause of the United States Constitution. The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8.  While the Clause affirmatively grants power to Congress, it also prohibits certain state actions that discriminate against or burden the interstate flow of commerce. *Or. Waste Sys., Inc. v. Dep. of Env. Quality of State of Or.*, 511 U.S. 93, 98 (1994). The effect of the Clause in this latter role is commonly referred to as the dormant Commerce Clause. Among its various roles, the dormant Commerce Clause precludes a state from "mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders or to the products derived therefrom." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 576 (1997).  In evaluating whether a state law violates the dormant Commerce Clause, a court must determine whether the law discriminates against interstate

commerce and, if so, whether sufficient justification exists for that burden. *See Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004).

The court, however, need not engage in this analysis to test the strength of Plaintiff's claim, because it is likely that the dormant Commerce Clause will not be implicated in this case. The dormant Commerce Clause is operative only when Congress has remained silent on an issue affecting interstate commerce. *See Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1177 (9th Cir. 2011). In the present circumstances, though, it appears Congress has spoken. Section 6036 of the Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act of 2005 provides in relevant part:

> (b) Declaration of Policy and Construction of Congressional Silence-
>
> (1) IN GENERAL.-It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries, including by means of laws or regulations that differentiate between residents and nonresidents of such State with respect to the availability of licenses or permits for taking of particular species of fish or wildlife, the kind and numbers of fish and wildlife that may be taken, or the fees charged in connection with issuance of licenses or permits for hunting or fishing.
>
> (2) CONSTRUCTION OF CONGRESSIONAL SILENCE.-Silence on the part of Congress shall not be construed to impose any barrier under clause 3 of Section 8 of Article I of the Constitution (commonly referred to as the "commerce clause") to the regulation of hunting or fishing by a State or Indian tribe.

P.L. 109-52, § 6036. This language expressly affirms California's authority "to regulate the taking *for any purpose* of fish and wildlife" and precludes the invoking of the dormant Commerce Clause to challenge any such state laws or regulations. *Id.* (emphasis added); *see Hoeven v. Minnesota*, 456 F.3d 826 (8th Cir. 2006); *Schutz v. Thome*, 415 F.3d 1128 (10th Cir. 2005). Furthermore, Congress explicitly states that its silence on issues concerning state fishing regulation "shall not be construed to impose any barrier" under the dormant Commerce Clause. P.L. 109-52, § 6036. Section 6036 therefore likely bars Plaintiff's dormant Commerce Clause claim.

**2. The Privileges and Immunities Clause**

The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The drafters of the Constitution intended the Clause "'to create a national economic union,'"

4

*Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008) (quoting *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 290 (1985)), by "'plac[ing] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'"[1] *Id.* (quoting *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64 (1988)).  While the Clause bars discrimination against citizens of other states merely because they are citizens from another state, it does not prohibit differential fee structures, or other "'disparity of treatment in the many situations where there are perfectly valid independent reasons for it.'"  *Id.* (quoting *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)).

Courts employ a two-step test to determine whether residency classifications run afoul of the Clause.  First, a court must determine "whether the activity in question is 'sufficiently basic to the livelihood of the nation . . . as to fall within the purview of the Privileges and Immunities Clause.'" *Id.* (quoting *Friedman*, 487 U.S. at 64) (ellipses in original) (emphasis removed).  If the court finds that the contested restriction falls within the Clause's ambit, the court will deem the restriction unconstitutional if the state cannot show that it is "'closely related to the advancement of a substantial state interest.'"  *Id.* (quoting *Friedman*, 487 at 65).  A substantial reason for state residency-based discrimination exists only if evidence indicates that "'non-citizens constitute a peculiar source of the evil at which the statute is aimed.'"  *Id.* (quoting *Toomer*, 334 U.S. at 398). Therefore, "the inquiry . . . must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them."  *Toomer*, 334 U.S. at 396 (footnote omitted).  The court may find the discriminating restriction not closely related to a substantial state interest if there exist "less restrictive means" to achieve that objective.  *Piper*, 470 U.S. at 284.

Applying the two-step analysis to this case, Plaintiff likely will be able to establish the first requirement; namely, that the activity affected by California's discriminatory licensing regime --

---

[1] The Supreme Court has held that citizenship and residency are "'essentially interchangeable'" under the terms of the Privileges and Immunities Clause.  *Council of Ins. Agents & Brokers*, 522 F.3d at 933 (quoting *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64 (1988)).

commercial fishing -- falls within the purview of the Privileges and Immunities Clause.[2]  Case law consistently has held that the ability to earn a living is one of the most fundamental privileges that receives the Clause's protection. *Council of Ins. Agents & Brokers*, 552 F.3d at 931 ("'[O]ne of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.'" (quoting *Toomer*, 334 U.S. at 396) (brackets in original)); *accord Piper*, 470 U.S. at 280 n.9 ("'[T]he pursuit of a common calling is one of the most fundamental of those privileges protected by the [Privileges and Immunities] Clause.'") (quoting *United Bldg. & Contr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of the City of Camden*, 465 U.S. 208, 219 (1984) (citing *Baldwin v. Mont. Fish & Game Comm'n*, 436 U.S. 371, 387 (1978))); *Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 266 (9th Cir. 1993) ("[T]he privilege involved in this case [commercial fishing] is a protected privilege, being termed . . . 'the right to earn a living.'") (citation omitted); *Int'l Org. of Masters, Mates & Pilots v. Andrews*, 831 F.2d 843, 845 (9th Cir. 1987); *see Toomer*, 334 U.S. at 403 (holding commercial shrimping within purview of Privileges and Immunities Clause).

However, Plaintiff's likelihood of prevailing at the second step of his Privileges and Immunities Clause challenge is far from clear.  Cases have discussed different potential methodologies for determining whether a fee differential is constitutionally valid.  It remains to be determined what methodology is appropriate in this case.  However, it is clear that any analysis of the differential fee structure will be fact-intensive.  At this early stage of the litigation, there are significant factual gaps in the parties' submissions that preclude the court from determining whether Plaintiff will likely show that the residency classifications within the contested statutes are closely related to a substantial state interest.

Defendants assert that the disparate fees charged to resident and nonresident commercial fishermen for the various licenses at issue reflect California's policy of requiring nonresident

---

[2] Defendants repeatedly argue that Plaintiff's claims do not implicate the Privileges and Immunities Clause because "[t]he Clause does not protect Plaintiff's right to reduce his operating expenses and, thus, earn *higher* profits." (Defs. Opp'n 5.)  This narrow characterization of the Clause's ambit has no basis in law.  It ignores the Supreme Court's command that the first prong of the Privileges and Immunities test focus on the "*activity*" that the challenged law restricts and not on how the law affects the activity. *Council of Ins. Agents & Brokers*, 522 F.3d at 934.

commercial fishermen to compensate the state for fishery conservation and management expenditures from which they benefit. (Defs. Opp'n 11.) Portions of the statutory scheme explicitly reflect this purpose. *See, e.g.*, Cal. Fish & Game Code §§ 8280 (requiring crab fishing vessels to obtain permit so that state may limit amount of fishing "to protect the Dungeness crab fishery"), 8550 (establishing herring permit regime to protect stocks from over fishing), 8850.5 (mandating that difference between resident and nonresident herring gill net permit fees be deposited into herring research and management fund). Courts have recognized the validity of this type of discriminatory countervailing fee structure as legitimate under the Privileges and Immunities Clause, as long as the higher fees do not overcompensate the state for the provided subsidies or burdens. *See Piper*, 470 U.S. at 284 n.17; *Mullaney v. Anderson*, 342 U.S. 415, 417 (1952); *Toomer*, 334 U.S. at 398-99.

However, the court cannot determine from the parties' submissions the proper methodology for assessing the extent to which California may recoup its fishery conservation and management expenditures from nonresident commercial fishermen. Plaintiff advocates treating the state's population per capita expenditures on fishery conservation and management as the maximum differential that California may charge a nonresident commercial fishermen over a resident commercial fishermen. (Pl. Mot. 10-14.) Defendants argue that the fee structure is constitutionally valid because the proportion of nonresident commercial fishermen fees to the total DFG fishery conservation and management budget is no greater than the proportion of nonresident commercial fishermen to all commercial fishermen operating in California. (Defs. Opp'n 11-14.)

Plaintiff cites to several cases to bolster his argument. (*See* Pl. Mot. 11 (citing *Tangier Sound Waterman's Ass'n*, 4 F.3d 264; *Carlson v. Alaska*, 798 P.2d 1269 (Alaska 1990).) In *Carlson*, the Alaska Supreme Court stated:

> The proper focus in our view is on whether residents and similarly situated nonresidents are being treated with substantial equality. The appropriate inquiry is thus whether all fees and taxes which must be paid to the state by a nonresident to enjoy the state-provided benefit are substantially equal to those which must be paid by similarly situated residents when the residents' *pro rata* shares of state revenues to which nonresidents make no contribution are taken into account.

7

798 P.2d at 1278. No other court has adopted Alaska's approach of limiting the nonresident fee differential to the taxes paid by each state resident for the state-provided benefit from which the nonresident will benefit. The Fourth Circuit case *Tangier Sound Waterman's Association* seems to support Alaska's reasoning at first glance. In that case, Virginia had established a discriminatory commercial fishing licensing regime to prevent the state from subsidizing nonresident commercial fishermen and to recover extra enforcement costs created by their presence. In dicta following its holding, the court cursorily agreed with the plaintiffs' contention that the fees Virginia charged to nonresident commercial fishermen were not closely tied to the state's interest in recovering subsidizes because "the nonresident harvester's license fee was derived by dividing what the state spends on all fishermen, recreational and commercial, by the number of resident commercial fishermen" -- the offending element being the inclusion of recreational fishermen. 4 F.3d at 268. However, the court already had struck down the fee system on other grounds, namely that the state had not provided a record showing that it had "created any credible method of allocating costs as between residents and nonresidents which places the burden equally or approximately equally upon residents and nonresidents." *Id.* at 267. The court never discussed how to discern whether residency-based fee discrimination closely relates to a substantial state interest

Defendants present cases supporting their reasoning as well. (Defs. Opp'n 11-13 (citing *Mullaney*, 342 U.S. 415; *Salorio v. Glaser*, 82 N.J. 482 (1980)).) In *Mullaney*, the Supreme Court commented that a state may charge nonresident commercial fishermen "a differential which would merely compensate the State for . . . any conservation expenditures from taxes which only residents pay," 342 U.S. at 417, a declaration that apparently allows a state to fully recover a subsidy it provides to nonresidents from those nonresidents. However, the Court ruled against Alaska because the then-territory had not produced a sufficient factual record to support the imposition of its statute. *Id.* at 418 ("Indeed the Tax Commissioner and his Special Deputy Enforcement Officer specifically disclaimed any knowledge of the dollar cost of enforcement. . . . [S]omething more is required than bald assertion to establish a reasonable relation between the higher fees and the higher cost to the Territory." (footnote omitted)). The Court thus never addressed what constituted proper means for calculating nonresident compensation. Similarly, in *Salorio*, which concerned a New Jersey tax on

8

1 commuters from New York, the New Jersey Supreme Court noted in its recitation of Privileges and
2 Immunities Clause law that "[a] state may therefore impose upon non-residents the additional
3 expenses occasioned by their activities within the state, or the reasonable costs of benefits which
4 they receive from the state," 82 N.J. at 503 (citations omitted), suggesting that a state could fully
5 recoup benefits given to nonresidents from those nonresidents. The court did not reach this issue,
6 however, because it remanded the case for further factual development that would permit the court
7 to perform the second step of the Privileges and Immunities Clause analysis. *Id.* at 508-09.

8 Against this legal backdrop, the court finds that Plaintiff has not provided a factual record
9 that would permit the court to rule in his favor. In his complaint, Plaintiff attacks the
10 constitutionality of several California statutes (Compl. ¶ 40(a)), which he concedes inflict varying
11 degrees of alleged harm upon nonresident commercial fishermen (Compl. ¶ 47). The arguments in
12 Plaintiff's briefs treat the statutes as a whole (*see generally* Pl. Mot.; Pl. Reply), even though the
13 court likely must determine the validity of each statute individually. Furthermore, case law
14 repeatedly has illuminated the fact intensive nature of the Privileges and Immunities inquiry. *See,*
15 *e.g.*, *Tangier Sound Waterman's Ass'n*, 4 F.3d at 267 (noting that court required data on various fees
16 and taxes paid by resident and nonresident commercial fishermen to perform analysis);
17 *Gospodonovich v. Clements*, 108 F. Supp. 234, 236-37 (E.D. La. 1951) (examining evidence "that
18 the resident and the nonresident commercial fishermen use substantially the same means and
19 methods" of fishing, "that there is no real distinction between the fishing vessels owned and
20 operated by resident commercial fishermen and those operated by nonresident commercial
21 fishermen," and that "[t]here is nothing in the record to support a conclusion that the cost of
22 enforcing the laws against nonresidents is greater" in Privileges and Immunities Clause analysis),
23 *appeal dismissed*, 344 U.S. 911 (1953); *Salorio*, 82 N.J. 482 (remanding case for further

development of factual record so court could perform step two of Privileges and Immunities Clause test).[3]

In the present matter, Plaintiff has not provided the court with, for example, evidence showing how much the DFG spends specifically on fishery conservation or management (in total and for herring and Dungeness crab individually) or the fees and costs incurred by resident and nonresident commercial fishermen operating in California waters.  Indeed, Plaintiff's DFG budget figures do not even differentiate among costs devoted to management of game as opposed to fish. (*See, e.g.*, Gross Decl. Ex. C (detailing DFG's financing and expenditures without providing information with respect to solely commercial fishing or subcategories thereof).)  Without these types of data, the court cannot move forward, let alone issue a preliminary injunction.  *See Mayview Corp.*, 480 F.2d at 719 ("The district court . . . could not make specific findings which might have resolved the many disputed factual issues herein. So far as we can tell in the absence of such findings, no injunction would have been warranted because of [Plaintiff's] failure to establish that he was clearly entitled to it.").

---

[3] In *Solorio*, the New Jersey Supreme Court vividly attested to the detailed, relevant facts necessary to conduct its analysis:

> The evidence here presented falls far short of showing that the non-residents are taxed only to the extent of their contribution to the transportation problem. We are therefore unable to apply the correct constitutional standard of "substantial equality" to the record before us. A remand is accordingly necessary to permit a full exploration of the benefits and burdens to non-resident commuters occasioned by State transportation programs and imposition of the [nonresident commuter tax]. In view of our disposition of this case, we now set out guidelines for further trial proceedings.
>
> On remand, evidence should be introduced to enable the trial court to compare the transportation benefits New York residents receive and the tax contributions they are required to make. The data must therefore include statistics on annual state and local expenditures identified by source for commuter rail and bus services and for construction and maintenance of highways used by interstate commuters. Figures on the amount and application of ETT monies must also be presented. Commutation figures must be introduced for the years during which non-residents paid emergency transportation taxes. The total number of New Jersey to New York commuters and the proportion by which they exceed New York to New Jersey commuters would be a relevant consideration. Travel figures must also take into account the substantial amount of intrastate use of all facilities funded.

82 N.J. 508-09 (footnotes omitted).

In sum, because of the significant gaps in the record, the court cannot find that Plaintiff has shown that he will likely prevail on his Privileges and Immunities Clause claim. *See id.* Nevertheless, due to the same uncertainties, the court finds that he has raised serious questions going to the merits.

### 3. Equal Protection Clause

Plaintiff has not shown that he will likely prevail on his Equal Protection claim. The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It embodies the ideal that "all persons lawfully in the United States shall abide in any state on an equality of legal privileges with all citizens under nondiscriminatory laws." *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948). The first inquiry in equal protection analysis is whether the legislation "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *see Barber v. State of Hawai'i*, 42 F.3d 1185, 1197 (9th Cir. 1995) ("To infringe upon a fundamental right, the regulation must impose a penalty effecting a genuinely significant deprivation such as a denial of the basic necessities of life or the denial of a fundamental political right."). If strict scrutiny is applied, the court will strike down the legislation unless the classification drawn by the legislation is "suitably tailored to serve a compelling state interest." *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). If strict scrutiny does not apply, the court will presume the challenged classification to be constitutional so long as the classification is rationally related to a legitimate governmental purpose. *Id.*

Nonresidents are not a suspect class, *Baldwin*, 436 U.S. at 389, and Plaintiffs do not allege that the challenged classification offends any recognized fundamental right. Therefore, the court must determine whether California's differential fees rationally further a legitimate state purpose. Courts have routinely held that states have a legitimate interest in offsetting subsidies to nonresidents, *see id.* at 391; *Barber*, 42 F.3d at 1196; *Haw. Boating Ass'n v. Water Transp. Facilities Div., Dep't of Transp., State of Haw.*, 651 F.2d 661, 666 (9th Cir. 1981), which

1  Defendants claim California's differential fees aim to accomplish. (Def.'s Opp. at 14.) Thus,
2  Plaintiff has not shown that he will likely succeed on the merits of this claim.

### B. The Balance of Hardships

Although Plaintiff has raised serious questions going to the merits of his Privileges and Immunities claim, he has not shown the requisite counterpart: that the balance of hardships tips sharply in his favor. Plaintiff identifies only one hardship in this case: On October 7, 2011, Plaintiff is likely to pay $3,735.75 in excess of fees charged to residents for the same permits, licenses, and registrations. Other putative class members likely will also pay some amount of excess fees. It is possible that the payments will be non-recoverable, even if Plaintiff and class members ultimately prevail in their challenge. Although the court acknowledges that this amount of money is not insubstantial, Plaintiff has paid the differential fees since at least 1990. (Pl.'s Aff. ¶ 3.) His delay in seeking a preliminary injunction strongly suggests that the situation is not urgent. *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief").

In contrast, issuance of the requested injunction will significantly interfere with the internal processes of the DFG. Defendants will suffer administrative costs to establish the requested escrow account, which will reduce funds available to DFG to conduct its operations. Defendants will also endure hardship by being enjoined from enforcement of four duly-enacted California statutes. *See Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."). The court concludes the balance of hardships does not tip sharply in Plaintiff's favor.

### IV. CONCLUSION

Although Plaintiff has presented serious questions going to the merits, he has not demonstrated that the hardships tip sharply in his favor. Because this failure proves dispositive of

1 Plaintiff's motion, the court need not address irreparable harm or public interest prongs of the preliminary
2 injunction inquiry. Plaintiff's Motion for Preliminary Injunction is **DENIED**.

4 IT IS SO ORDERED.

6 Dated: October 3, 2011

DONNA M. RYU
United States Magistrate Judge