United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN MARILLEY,          *et al.*,                    No. C-11-02418 DMR

            Plaintiffs,                      **ORDER ON PARTIES' CROSS
                                             MOTIONS FOR SUMMARY
      v.                                     JUDGMENT [DOCKET NOS. 201, 205]
                                             AND EVIDENTIARY MOTIONS
CHARLTON BONHAM,                             [DOCKET NOS. 215, 216, 218, 219, and
                                             227]**
            Defendant.
_____/

## I. Introduction

Plaintiffs represent a class of commercial fishermen who ply their trade in California's waters, but who are not California residents.  The plaintiff class challenges California's commercial fishing licensing statutes, which charge them two to three times more than the fees assessed on their competitors who are California residents.  Plaintiffs assert that these differential fees are unconstitutional.  Before the court are the parties' cross motions for summary judgment, as well as related motions challenging expert and other testimony submitted in support of these motions. [Docket Nos. 201, 205, 215, 216, 218, 219, and 227.]  Having carefully considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the court hereby grants Plaintiffs' motion for summary judgment and denies Defendant's motion for summary judgment.

**United States District Court**
For the Northern District of California

## II. Background

California requires commercial fishermen to have a state-issued license to "take fish or amphibia for commercial purposes." Cal. Fish & Game Code § 7850(a). In addition, California requires "[e]very person who owns or operates a vessel in public waters in connection with fishing operations for profit in this state" to obtain a commercial boat registration. Cal. Fish & Game Code. § 7881(a). At issue in this lawsuit are four California statutes which establish differential fees for nonresidents to fish commercially in California. *See* Cal. Fish & Game Code §§ 7852 (commercial fishing licenses), 7881 (commercial fishing vessel registrations), 8550.5 (herring gill net permits), 8280.6 (Dungeness Crab vessel permits). In the 2012-2013 license year, which ran from April 1, 2012 through March 31, 2013, the fees at issue were as follows:

- Commercial fishing license      $130.03 (residents); $385.75 (nonresidents)
- Vessel registration      $338.75 (residents); $1002.25 (nonresidents)
- Herring gill net permit      $359.00 (residents); $1,334.25 (nonresidents)
- Dungeness Crab vessel permit      $273.00 (residents); $538.00 (nonresidents)

(Corrected Gross Decl. ("Corr. Gross Decl."), March 14, 2013, ¶ 2, Ex. 1.) These are the only California commercial fishing fees that differentiate between residents and nonresidents.[1] (Corr. Gross Decl. Ex. 1.)

Plaintiffs are nonresident commercial fishermen. They represent a class of individuals who, since 2009, have purchased or renewed commercial fishing licenses, permits, and/or registrations and were required to pay nonresident fees. Plaintiffs challenge the constitutionality of California's differential fees under the Privileges and Immunities Clause and the Equal Protection Clause of the United States Constitution. Defendant Charlton Bonham is the Director of the California

---

[1] To illustrate, in the 2012-2013 license year, a nonresident herring fisherman who held three herring gill net permits and harvested herring from his or her own boat paid $5,390.75 in fees for the required permits, license, and boat registration. A resident herring fisherman paid a total of $1,545.78 for the same required permits, license, and registration, a difference of $3,844.97. (*See* Corr. Gross Decl. Ex. 1.)

United States District Court

For the Northern District of California

1  Department of Fish and Game ("DFG")[2], which has authority to administer and enforce policies and

2  provisions of the California Fish and Game Code and associated regulations.

3                          **III.  Statutory History**

4          California established the first commercial fishing fee differential in 1986.  The bill that

5  established the differential, AB 3081, set the herring gill net permit fee at $300 for nonresidents and

6  $200 for residents and increased a number of other commercial fishing fees.  (Supplemental Neill

7  Decl. ("Suppl. Neill Decl."), May 6, 2013, ¶¶ 7, 16; Corr. Gross Decl. ¶ 20, Ex. 19.[3][4])  A bill

8  analysis by the Senate Committee on Natural Resources and Wildlife indicates that the fee changes

9  were driven by a shortfall between expenditures and revenues for commercial fishing programs, as

10  DFG relied "almost exclusively on revenues from commercial fishing and fish business licenses,

11  permits, and taxes to support its commercial fishing programs."  (Suppl. Gross Decl. ¶ 22; Corr.

12  Gross Decl. Ex. 11 at 2.)

13          In 1990, the legislature passed AB 2126, which increased the herring gill net permit fees for

14  residents and nonresidents.  (Suppl. Gross Decl. ¶ 53; Corr. Gross Decl. Ex. 57.)  An Assembly

15  Committee on Water, Parks, and Wildlife analysis of a companion bill, AB 3158, indicates that DFG

16  was again facing a budget deficit.  (Suppl. Neill Decl. ¶ 17; Corr. Gross Decl. Ex. 22.)  At the time

17  the bills were before the legislature, Vern Goehring was the legislative coordinator for DFG and

18  Maria Mechiorre was an Associate Government Program Analyst in DFG's License and Revenue

19  Branch.  (Corr. Gross Decl. Ex. 270 (Goehring Dep., Dec. 21, 2012), 21-22, 55, 69; Ex. 271

20

21          [2] Effective January 1, 2013, the Department of Fish and Game was renamed the "Department
22  of Fish and Wildlife."  Cal. Fish & Game Code § 700.  The court will use DFG throughout this order.

23          [3] Defendant objected to this and to nearly all of Plaintiffs' exhibits on the ground that Plaintiffs
   did not properly authenticate them because the authenticating declarant lacked personal knowledge.
24  After reviewing the supplemental declarations of Stuart G. Gross and Isaac Neill the court is satisfied
   that all of the documents submitted in connection with Plaintiffs' motion and opposition to Defendant's
25  motion are what they purport to be.  *See* Fed. R. Evid. 901(b); *see also* Supplemental Gross Decl.
   ("Suppl. Gross Decl."), May 9, 2013; Supplemental Neill Decl. ("Suppl. Neill Decl."), May 6, 2013.
26  Accordingly, Defendant's authenticity objections are overruled.

27          [4] The bill also established a differential fee structure for round haul permit fees.  Gill nets and
   round haul nets are used to harvest herring.  (Corr. Gross Decl. ¶ 241, Ex. 240.)  The use of round haul
28  nets in California's fisheries is now prohibited and this fee is not at issue in this case.  *See* Cal. Code
   Regs tit. 14 § 163(f)(2) (2013).

United States District Court
For the Northern District of California

1   (Melchiorre Dep. Vol. I, Jan. 10), 2013, 67-68.)  Goehring and Melchiorre each testified that they

2   did not recall any connection between the budget issues and nonresident herring fishermen or

3   nonresident fishermen in general at the time the bills were pending.  (Goehring Dep. 103, 138-39;

4   Corr. Gross Decl. Ex. 272 (Melchiorre Dep. Vol. II, Jan. 24, 2013), 239-41, 250.)

5       The provision of the 1990 bill that increased the herring gill net permit fees contained a

6   "sunset" provision by which it was to expire on January 1, 1992.  (Corr. Gross Decl. Ex. 57.)  DFG

7   acted to restore the differential fees, and in March 1992, in a document titled "Commercial Fishing

8   Funding Alternative," DFG described the disparity between estimated commercial fishing program

9   expenditures and revenues if the fees established in 1986 were not replaced.  (Suppl. Gross Decl. ¶

10  70; Corr. Gross Decl. ¶ 75, Ex. 74.)  Nothing in the document or in the record identifies a

11  relationship between the projected budget shortfall and nonresident commercial fishermen.  Later

12  that year, the legislature passed a bill that more than doubled the nonresident herring gill net permit

13  fee from $400 to $1,000,[5] while leaving the resident fee unchanged at $265.  The bill also

14  established higher nonresident fees for commercial fishing vessel registrations and commercial

15  fishing licenses.  (Suppl. Gross Decl. ¶ 104; Corr. Gross Decl. Ex. 110.)  Neither Goehring nor

16  Melchiorre identified nonresidents as the source of any increased burden on the fisheries to explain

17  why the legislature mandated that they pay higher fees.  (Goehring Dep. 180; Melchiorre Dep. Vol.

18  II 240-41, 266-68, 272, 289.)

19      In 1994, the legislature established differential fees for the Dungeness crab fishery.  AB 3337

20  created a limited entry structure for the Dungeness crab fishery and set the Dungeness crab vessel

21  permit fee at $400 for nonresidents and $200 for residents.  (Suppl. Gross Decl. ¶ 145; Corr. Gross

22

23      [5] Plaintiffs submitted evidence that earlier proposed amendments to the bill contemplated raising
    the nonresident gill net permit fee to $660 and the nonresident round haul net permit fee to $1,000.  (See

24  Supp. Gross Decl. ¶¶ 84, 86; Corr. Gross Decl. Exs. 88, 90.)  Plaintiffs argue that SB 1565 ultimately
    raised the nonresident herring gill net permit fee to $1,000 as the result of a typographical error during

25  the legislative process, whereby the numbers for the gill net permit fee and round haul net permit fee
    were mistakenly transposed on a chart.  (See Pls.' Mot. 18-24.)  Plaintiffs argue that the nonresident

26  herring gill net permit fee's genesis in a clerical error is evidence that the fee was arbitrary and therefore
    unconstitutional.  Defendant disputes Plaintiffs' claim that there was a clerical error, arguing that

27  Plaintiffs' evidence is inadmissible and inconclusive on the issue.  The court concludes that whether the
    nonresident herring gill net permit fee was set at $1,000 as the result of a clerical error is a genuine

28  dispute of fact which cannot be resolved on a motion for summary judgment.  The disputed fact,
    however, is not material to reaching a decision on these cross motions.

4

United States District Court

For the Northern District of California

Decl. Ex. 170.)  There is no evidence in the record that nonresident Dungeness crab fishermen were identified as the source of any added fishery enforcement or management burden.  Instead, the legislative history of the bill suggests a market or economic protectionist purpose to the limited entry structure and differential fees.  The Assembly Committee on Water, Parks, and Wildlife recommended a "no" vote on an early version of the bill, noting that it "provide[d] an unfair advantage to the sponsors of the bill – the Pacific Coast Federation of Fisherman [sic] [a resident fishermen advocacy group] – by making it very difficult for any new crab fishers to obtain permits and enter the market."  (Suppl. Neill Decl. ¶ 55; Corr. Gross Decl. Ex. 127 at 4; Ex. 273 (Grader Dep., Aug. 21, 2012), 233.)  In its analysis of a later version of the bill, DFG commented, "[t]his bill is an attempt to . . . control competition to California fishermen and processors from out of state." (Suppl. Neill Decl. ¶ 75; Corr. Gross Decl. Ex. 153 at 3.)  In its Enrolled Bill Report for the final version of the bill, DFG described it as "an industry sponsored bill to prevent out-of-state commercial fishermen from moving into California and getting an undue share of the California Dungeness crab resource . . ."  (Suppl. Neill Decl. ¶ 85; Corr. Gross Decl. Ex. 168 at 3[6].)

AB 3337 contained a sunset provision effective April 1, 1998.  The sunset applied to, *inter alia*, the bill's provisions regarding the Dungeness crab differential fees.  (Suppl. Gross Decl. ¶ 145; Corr. Gross Decl. Ex. 170.)  The legislature has extended the sunset five times, most recently in 2011.  (Suppl. Neill Decl. ¶¶ 88, 96, 103, 107, 112; Corr. Gross Decl. Exs. 173 (text of AB 666, 10/16/95), 181 (text of AB 2482, 9/12/00), 188 (text of AB 601, 3/31/06), 193 (text of AB 1442, 10/11/09), 201 (text of SB 369, 9/26/11).)  There is no record evidence that the legislature examined the basis for the differential fees or considered nonresident Dungeness crab fishermen's particular impact on the fishery at any point when extending the sunset.  In fact, the legislative history of the bills contains further evidence of a protectionist purpose.  For example, a Senate Republican

_____

[6] Defendant objected to this exhibit as improper legislative history on the grounds that there is no evidence that the document was considered by the entire legislature.  The objection is overruled.  *See Elsner v. Uveges*, 34 Cal. 4th 915, 934 n.19 (2004) (noting that "we have routinely found enrolled bill reports, prepared by a responsible agency contemporaneous with passage and before signing, instructive on matters of legislative intent.") (citations omitted).  Defendant's hearsay objection is also overruled; the document is not offered for the truth of the matters asserted therein but as evidence of legislative intent.

**United States District Court**
For the Northern District of California

1  Analysis of AB 601, passed in 2006, notes that "Republicans generally support the proper

2  management of important natural resources, but where resource management crosses the line into

3  economic protectionism it should be opposed . . . DFG should explore other management options

4  that focus on maintaining the crab population instead of the industry population." (Suppl. Neill

5  Decl. ¶ 100; Corr. Gross Decl. Ex. 185 at 2[7].) Similarly, a Senate Republican Floor Commentary

6  regarding AB 1442, which passed in 2009, comments that the Dungeness crab fishery's "restricted

7  access" structure "appear[ed] to be more about market protection for fishermen rather than the

8  conservation of crab." (Suppl. Neill Decl. ¶ 105; Corr. Gross Ex. 191 at 2.)

9  In 2003, the legislature raised nonresident fees for commercial fishing licenses and

10  commercial fishing vessel registration permits, setting them at three times the amounts paid by

11  residents. In addition, the legislature mandated that commercial fishing fees be subject to automatic

12  yearly indexing for inflation starting in 2005. (Suppl. Neill Decl. ¶ 124; Corr. Gross Decl. Ex. 230.)

13  To determine the annual fee, DFG multiplies each current fee by the rate published by the U.S.

14  Commerce Department; the sum of the result and the existing fee constitutes the new indexed fee.

15  *See* Cal. Fish & Game Code § 713(b)(1). Because nonresident fees are higher than resident fees, the

16  effect of indexing is to increase the amount of the differential between the fees every year.[8] There is

17  no sunset provision applicable to indexing, but California Fish & Game Code section 713 mandates

18  that at least every five years, DFG "shall analyze all fees for licenses . . . to ensure the appropriate

19  fee amount is charged," and where appropriate, shall recommend that fees be adjusted. *See* Cal. Fish

20  & Game Code § 713(g).

---

[7] Defendant objected to this exhibit and to Exhibit 191, a Senate Republican Floor Commentary regarding another bill, as improper legislative history, again asserting that there is no evidence that the documents went before the entire legislature. The objection is overruled. Both Senate Republican Caucus reports and Senate Floor Republican Commentaries on assembly bills may properly be considered as legislative history. *See People v. Allen*, 88 Cal. App. 4th 986, 995 n.16 (2001) (considering Senate Republican Caucus report); *Pac. Gas & Elec. Co. v. State Dep't of Water Res.*, 112 Cal. App. 4th 477, 498 (2003) (considering Senate Republican Floor Commentaries). Defendant's hearsay objections are also overruled, as the documents are offered as evidence of legislative intent, not for the truth of the matters asserted therein.

[8] For example, in 2004, the resident herring gill net permit fee was $265 and the nonresident fee was $1,000, for a differential of $735. In 2012, as a result of automatic indexing, the differential had grown to $975.25 ($351.50 resident fee and $1,326.75 nonresident fee). (*See* Corr. Gross Decl. ¶ 3, Ex. 2.)

**IV.  Evidentiary Motions**

The parties filed five motions to exclude evidence submitted in support of the cross motions for summary judgment.  Plaintiffs filed motions to exclude the opinions offered by Defendant's expert witnesses, Tony Warrington and Chiara Trabucchi, and a motion to strike the declaration of Defendant's lay witness, Helen Carriker.  [Docket Nos. 218, 219, 227.]  Defendant filed a motion to exclude the opinion offered by Plaintiffs' expert witness, Douglas Larson, as well as a motion for sanctions regarding Larson's expert report.  [Docket Nos. 215, 216.]  In general, the challenged evidence relates to California's investment in its commercial fisheries as well as resident and nonresident participation in the fisheries.  The court will address the evidentiary motions before turning to its analysis of the parties' cross motions for summary judgment.

**A.      Plaintiffs' Motion to Strike the Declaration of Helen Carriker**

Defendant submitted a declaration by Helen Carriker, DFG's Deputy Director of Administration.  Her declaration covers several topics, including DFG licensing statistics for the licenses, permits, and registrations at issue, as well as DFG's commercial fishing revenues and expenditures.  Plaintiffs move pursuant to Federal Rules of Civil Procedure 26 and 37 to strike certain portions of her declaration on the grounds that her declaration contains new data, analysis, and conclusions that were not disclosed to Plaintiffs during the course of discovery.  [Docket No. 227 (Pls.' Mot. to Strike).]

**1.      Legal Standard**

Federal Rule of Civil Procedure 26 provides that a party must supplement or correct its discovery responses if the disclosing party learns that the responses are "incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties" during discovery.  Fed. R. Civ. P. 26(e)(1).  If a party fails to supplement its discovery responses as required by Rule 26(e), "that party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

**2.      Analysis**

**United States District Court**
For the Northern District of California

Plaintiffs argue that Defendant has "revealed for the first time new data and analysis regarding the financial impact of the State's management of its commercial fisheries and the corresponding benefits to commercial fishermen." (Pls.' Mot. to Strike 8.)  Specifically, Plaintiffs contend that they propounded numerous interrogatories seeking all facts regarding California's expenditures and revenues related to commercial fishing and Defendant's theories regarding why higher nonresident fees are justified.  However, Plaintiffs argue, Carriker presents, *inter alia*, "new assessments of the percentage of nonresident commercial fishermen who hold the disputed licenses" and new evidence regarding annual commercial fishing revenues.  (Pls.' Mot. to Strike 8; *see* Carriker Decl., Apr. 11, 2013, ¶¶ 9-27, 38.)  Accordingly, Plaintiffs assert that pursuant to Rule 37, the court should strike portions of her declaration based upon Defendant's failure to supplement its discovery responses.

First, Plaintiffs argue that they propounded an interrogatory seeking the identification of the total numbers of residents and nonresidents who participated in California's commercial fisheries, including all facts to support these figures.  Defendant responded that the information could be derived from documents it produced in discovery.  (Pls.' Mot. to Strike 3.)  In her declaration, Carriker set forth her calculations of the percentages of each of the disputed licenses held by nonresidents.  (Carriker Decl. ¶¶ 9-27.)  For example, for the 2012 license year, Carriker states, "nonresidents made up 12.9% of licensed commercial fishermen.  I calculated this figure, using Exhibit X, by dividing 875 (nonresidents) by 6,750 total licenses (5875 + 875)."  (Carriker Decl. ¶ 15.)  According to Plaintiffs, "Defendant failed to disclose this new analysis of nonresident participation in California fisheries and the calculations on which it relies in his discovery responses."  (Pls.' Mot. to Strike 3.)  The court finds this argument unavailing.  Plaintiffs do not assert that Defendant did not disclose the licensing data upon which Carriker relied to calculate the percentage of each disputed license held by nonresidents.  Translating previously-disclosed data into percentages using basic mathematics is not equivalent to failing to disclose the data itself.

The court also finds unpersuasive Plaintiffs' argument regarding Defendant's purported failure to disclose Carriker's calculations of an annual "average of total commercial fishing revenues . . . of $5,800,491." (Carriker Decl. ¶ 38.)  This estimate is based on the total of Carriker's six-year

1   averages of landing taxes and license revenue (including commercial fishing licenses and

2   commercial fish business licenses).  (Carriker Decl. ¶¶ 28-38.)  In response to an interrogatory

3   seeking all facts supporting Defendant's contention that California subsidizes nonresidents,

4   Defendant stated that annual commercial fishing revenues were "generally under $6 million."  (Pls.'

5   Mot. to Strike 4.)  Plaintiffs argue that Defendant did not disclose the yearly data for each category,

6   nor the methodology she used to calculate the averages for each category.  However, Defendant

7   identified the data sources for the "under $6 million" figure as documents provided to Plaintiffs, and

8   produced a spreadsheet of landing tax revenue data.  (Def.'s Opp'n to Mot. to Strike 6; *see*

9   Meckenstock Decl., Apr. 11, 2013, ¶ 48; Carriker Decl. ¶¶ 30, 33, 37.)  Further, Carriker described

10  her methodology; she used simple averages for each type of revenue.  (*See* Carriker Decl. ¶ 32 ("The

11  average annual revenue [from commercial fishing licenses] during that period was $3,753,223

12  ($22,519,337 divided by 6 years).").)  The court concludes that Defendant did not fail to disclose the

13  information underlying Carriker's calculations.  Accordingly, Plaintiffs' motion to strike paragraphs

14  9-27 and 30-39 of Carriker's declaration is denied.[9]

15          **B.      Plaintiffs' Motion to Exclude the Expert Testimony of Tony Warrington**

16          In his motion, Defendant makes arguments using high and low estimates of DFG's total

17  commercial fishing expenditures (not including offsetting revenues) in fiscal year 2010-11.[10]  (*See*

18  Def.'s Mot. 4-6; *see also* discussion, *infra*, at § VI(A)(2).)  A large portion of DFG's estimated

19  expenditures represents commercial fisheries management expenditures that the state tracks in the

20  Governor's Budget under the code "25.20."  (Carriker Decl. ¶¶ 40-42, 46, 49.)  The remaining

21  amount is based upon Defendant's estimate of enforcement costs, which is the largest single DFG

22  expenditure that is not represented in the 25.20 figure.  (Carriker Decl. ¶ 47.)

23

24  _____

25          [9] As the court does not rely on the remainder of Carriker's declaration in ruling on the parties'
    cross motions for summary judgment, it need not reach Plaintiffs' motion to strike paragraphs 56-59 and
26  74-77 of her declaration.

27          [10] Defendant's two estimates vary depending on which set of funding sources are used.  The
    higher number takes into account all funding sources, while the lower number is limited to only the three
28  most significant state funds, the Fish and Game Preservation Fund, the General Fund, and the
    Environmental License Plate Fund.  (Def.'s Mot. 6-7.)

United States District Court

For the Northern District of California

1    Defendant submitted a declaration by Tony Warrington, an Assistant Chief with DFG's Law

2   Enforcement Division, in which he stated that his "reasonable and conservative" estimate of DFG's

3   commercial fishing enforcement costs for fiscal year 2010-11 is $10,320,963.[11]  (Warrington Decl.,

4   Apr. 11, 2013, ¶ 91.)  Warrington calculated this amount in part by estimating the percentage of

5   hours DFG's Law Enforcement Division ("LED") employees spend on commercial fishing

6   enforcement tasks.  Warrington divided all LED sworn law enforcement personnel into three groups

7   based on their connection to commercial fishing enforcement: 1) crews on large patrol boats; 2)

8   other coastal officers; and 3) remaining sworn personnel.  (Warrington Decl. ¶ 24.)  He estimated

9   that the three groups spend 80%, 30%, and 5%, respectively, of their time on commercial fishing

10  enforcement activities.  (Warrington Decl. ¶¶ 25-39.)  He then calculated the total annual personnel-

11  related expenses based on his estimates, as well as other enforcement-related expenses, such as

12  operating expenses; boat, aircraft, and facilities expenses; and equipment costs, to arrive at his

13  estimate for the total amount DFG spends on commercial fishing enforcement.  (*See* Warrington

14  Decl. ¶¶ 59-90.)

15    Plaintiffs move to exclude Warrington's testimony under Federal Rule of Evidence 702 and

16  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  [Docket No. 218.]

17          **1.    Legal Standard for Exclusion of Expert Evidence**

18    Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific

19  testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  The

20  objective of this requirement "is to make certain that an expert, whether basing testimony upon

21  professional studies or personal experience, employs in the courtroom the same level of intellectual

22  rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v.*

23  *Carmichael,* 526 U.S. 137, 152 (1999).  Under Federal Rule of Evidence 702, a qualified expert may

24  testify only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier

25

26    [11] Warrington also calculates a lower estimate of enforcement costs, $9,100,013.88, which is
    based on the three primary state funds alone.  Warrington's two estimates of enforcement costs for fiscal
27  year 2010-11, along with commercial fishing expenditures reported under code 25.20 in the Governor's
    Budget and Carriker's estimate of average commercial fishing revenues, (*see* Carriker Decl. ¶¶ 38, 48,
28  49), form the basis for Defendant's estimate that California invests $12-14 million, after revenues, in
    its commercial fisheries.  (*See* Def.'s Mot. 4-7, 32, and discussion *infra*, at § VI(A)(2).)

United States District Court

For the Northern District of California

1   of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on

2   sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d)

3   the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.

4   702. Rule 702 sets forth three distinct but related requirements: "(1) the subject matter at issue must

5   be beyond the common knowledge of the average layman; (2) the witness must have sufficient

6   expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a

7   reasonable opinion." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) (citation omitted).

8           The threshold for qualification is low; a minimal foundation of knowledge, skill, and

9   experience suffices. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th

10  Cir. 2004). The court retains "considerable leeway in deciding in a particular case how to go about

11  determining whether particular expert testimony is reliable." *Kumho Tire,* 526 U.S. at 152. The

12  gatekeeping inquiry must be tailored to the facts of the case and the type of expert testimony at

13  issue. *Id.* "[A] trial court not only has broad latitude in determining whether an expert's testimony

14  is reliable, but also in deciding *how* to determine the testimony's reliability." *Hangarter*, 373 F.3d

15  at 1017 (citing *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002)

16  (quotation marks omitted) (emphasis in original).

17          **2.      Analysis**

18          Plaintiffs contend that Warrington is not qualified to opine on the subject of his offered

19  testimony, and make several arguments that his estimates are not based on a reliable methodology or

20  foundation. Plaintiffs challenge Warrington's opinions about the percentage of time each of the

21  three groups of wardens spends on commercial fishing enforcement activities. Plaintiffs do not

22  challenge Warrington's translation of the estimated hours that DFG employees spend on

23  enforcement activities into his estimate of actual costs. Essentially, Plaintiffs argue that Warrington

24  offered an opinion about how wardens spend their time that should have been grounded in statistical

25  reasoning, and that he did not employ any recognized statistical methodology nor is he qualified to

26  do so. Therefore, Plaintiffs argue, Warrington's opinion is not reliable under Rule 702.

27          The court disagrees. As the Supreme Court has recognized, certain types of expert testimony

28  "'rests upon scientific foundations, the reliability of which will be at issue in some cases . . . . In

other cases, the relevant reliability concerns may focus upon *personal knowledge or experience*.'"

*Hangarter*, 373 F.3d at 1017 (quoting *Kumho Tire*, 526 U.S. at 150) (emphasis in original); *see also*

Fed. R. Evid. 702(a)(1) (experts may qualify based on "scientific, technical, or *other specialized*

*knowledge*." (emphasis added)).  To determine if an expert is qualified, the court must consider "the

expert's particular expertise, and the subject of his testimony."  *Kumho Tire*, 526 U.S. at 147.  Here,

Warrington has offered his opinion regarding DFG's enforcement costs.  His opinion is based upon,

*inter alia*, his estimates of how much time DFG sworn law enforcement personnel spend on

commercial fishing enforcement tasks.  Warrington's extensive experience qualifies him to testify to

such matters.  Having been a DFG law enforcement officer for 23 years, with a significant amount of

experience in the marine environment, Warrington has performed the duties in question himself.

(Warrington Decl. ¶¶ 4-11.)  In addition to his direct experience in "near shore and offshore"

enforcement, he spent seven years as the Assistant Chief responsible for "statewide marine

coordination" and eight months managing all marine programs and personnel statewide.

(Warrington Decl. ¶¶ 5, 6, 9, 10.)  The court finds that Warrington is qualified to opine on the job

duties performed by DFG sworn law enforcement personnel, and correspondingly, on the proportion

of time they spend performing duties related to commercial fishing enforcement.  Moreover,

Warrington has prepared numerous estimates of DFG enforcement costs "for internal DFG use, for

reports to the California Legislature, and for reports to the California Fish and Game Commission,"

and has presented such estimates to the Legislature and to the Fish and Game Commission.

(Warrington Decl. ¶ 12.)  Based on Warrington's knowledge and experience, both in law

enforcement and estimating enforcement costs, the court finds his opinion reliable.  *See Living*

*Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353, 368 n.14 (9th Cir. 2005) (for non-

scientific, non-technical testimony, "reliability depends heavily on the *knowledge and experience* of

the expert, rather than the methodology or theory behind it." (emphasis in original) (internal

quotation omitted)).  Plaintiffs' motion to exclude Warrington's testimony is denied.[12]

---

[12] Plaintiffs also move to exclude the testimony of Defendant's retained expert witness, Chiara
Trabucchi.  [Docket No. 219.]  Defendant moves to exclude the testimony of Plaintiffs' retained expert
witness, Douglas Larson, and also moved for sanctions in the form of an order striking portions of
Larson's report on the grounds that Plaintiffs improperly disclosed him as a rebuttal expert instead of

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.  Legal Standards

### A.      Summary Judgment

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor.  *Id.* at 248.  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Where the defendant has the ultimate burden of proof, the plaintiff may prevail on a motion for summary judgment simply by pointing to the defendant's failure "to make a showing sufficient to establish the existence of an element essential to [the defendant's] case."  *Celotex*, 477 U.S. at 322.

### B.      Privileges and Immunities Clause

The Privileges and Immunities Clause ("the Clause") states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. art. IV, § 2, cl. 1.  The drafters of the Constitution intended the Clause "'to create a national economic

---

as an affirmative expert.  [Docket Nos. 215, 216].  As the court does not rely on the opinions of Trabucchi or Larson in ruling on the parties' cross motions for summary judgment, it need not reach the *Daubert* motions as to these two experts.  Defendant's motion for sanctions regarding Larson is denied as moot.

United States District Court

For the Northern District of California

1  union,'" *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 934 (9th Cir. 2008)

2  (quoting *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 280 (1985)), by "'plac[ing] the citizens of

3  each State upon the same footing with citizens of other States, so far as the advantages resulting

4  from citizenship in those States are concerned.'"[13] *Id.* (quoting *Supreme Court of Va. v. Friedman*,

5  487 U.S. 59, 64 (1988)).  The Clause "seeks to ensure the unity of the several states by protecting

6  those interests of nonresidents which are fundamental to the promotion of interstate harmony," *Int'l*

7  *Org. of Masters, Mates & Pilots v. Andrews*, 831 F.2d 843, 845 (9th Cir. 1987) (quoting *United*

8  *Bldg. & Constr. Trades Council v. City of Camden*, 465 U.S. 208, 218 (1984)) (internal quotation

9  marks omitted), and "protects the right of citizens to 'ply their trade, practice their occupation, or

10  pursue a common calling.'"  *McBurney v. Young*, 133 S. Ct. 1709, 1715 (2013) (quoting *Hicklin v.*

11  *Orbeck*, 437 U.S. 518, 524 (1978)).  While the Clause "forbids a State from intentionally giving its

12  own citizens a competitive advantage in business or employment," *id.* at 1716, it does not prohibit

13  differential fee structures, or other "'disparity of treatment in the many situations where there are

14  perfectly valid independent reasons for it.'"  *Molasky-Arman*, 522 F.3d at 934 (quoting *Toomer v.*

15  *Witsell*, 334 U.S. 385, 396 (1948)).

16      Courts employ a two-step test to determine whether residency classifications run afoul of the

17  Clause.  First, a court must determine "whether the activity in question is 'sufficiently basic to the

18  livelihood of the nation . . . as to fall within the purview of the Privileges and Immunities Clause.'"

19  *Id.* (quoting *Friedman*, 487 U.S. at 64) (ellipses in original) (emphasis removed).  If the court finds

20  that the contested restriction falls within the Clause's ambit, the court will deem the restriction

21  unconstitutional if the state cannot show that it is "'closely related to the advancement of a

22  substantial state interest.'"  *Id.* (quoting *Friedman*, 487 U.S. at 65).  A substantial reason for state

23  residency-based discrimination exists if evidence indicates that "'non-citizens constitute a peculiar

24  source of the evil at which the statute is aimed.'"  *Id.* (quoting *Toomer*, 334 U.S. at 398).  Therefore,

25  "the inquiry . . . must be concerned with whether such reasons do exist and whether the degree of

---

27      [13] The Supreme Court has held that citizenship and residency are "'essentially interchangeable'"
28  under the terms of the Privileges and Immunities Clause.  *Molasky-Arman*, 522 F.3d at 933 (quoting
*Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64 (1988)).

**United States District Court**
For the Northern District of California

1   discrimination bears a close relation to them." *Toomer*, 334 U.S. at 396 (footnote omitted).  The

2   court may find the discriminating restriction not closely related to a substantial state interest if there

3   exist "less restrictive means" to achieve that objective.  *Piper*, 470 U.S. at 284.

4       **C.      Equal Protection Clause**

5           The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its

6   jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  It embodies the ideal

7   that "all persons lawfully in the United States shall abide in any state on an equality of legal

8   privileges with all citizens under nondiscriminatory laws."  *Takahashi v. Fish & Game Comm'n*, 334

9   U.S. 410, 420 (1948).  The first inquiry in the equal protection analysis is whether the legislation

10  "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly

11  or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny."  *San Antonio*

12  *Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *see Barber v. Haw.*, 42 F.3d 1185, 1197 (9th

13  Cir. 1994) ("To infringe upon a fundamental right, the regulation must impose a penalty effecting a

14  genuinely significant deprivation such as a denial of the basic necessities of life or the denial of a

15  fundamental political right.").  If strict scrutiny is applied, the court will strike down the legislation

16  unless the classification drawn by the legislation is "suitably tailored to serve a compelling state

17  interest."  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  If strict scrutiny

18  does not apply, the court will presume the challenged classification to be constitutional so long as

19  the classification is rationally related to a legitimate governmental purpose.  *Id.*  Nonresidents are

20  not a suspect class.  *See Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 389 (1978).

21                      **VI.  Discussion**

22      **A.      The Privileges and Immunities Clause**

23          **1.      Whether the Activity in Question Falls Within the Purview of the
                      Privileges and Immunities Clause**

24          At the first step of the analysis, a court must determine whether the activity in question falls

25  within the purview of the Clause.  Plaintiffs argue that the activity affected by California's

26  differential fee structure – commercial fishing – involves the ability to earn a living, one of the most

27  fundamental privileges that receives the Clause's protection.  *See, e.g., Toomer*, 334 U.S. at 403

28

United States District Court

For the Northern District of California

(holding that "commercial shrimping . . . like other common callings, is within the purview of the privileges and immunities clause."); *Tangier Sound Waterman's Ass'n v. Pruitt*, 4 F.3d 264, 266 (4th Cir. 1993) ("[T]he privilege involved in this case [commercial fishing] is a protected privilege, being termed . . . 'the right to earn a living.'" (citation omitted)).  Defendant advances three arguments in support of his position that the challenged activity does not trigger constitutional protection.  None of them is persuasive.

To begin with, Defendant argues that at the first step of the inquiry, Plaintiffs must make a showing that California fails to treat nonresidents on terms of substantial equality with residents.  Defendant asserts that the protected privilege at stake is "'that of [citizens of State A] doing business in State B on terms of substantial equality with the citizens of that State.'"  (Def.'s Mot. 20 (quoting *Friedman*, 487 U.S. at 65 (internal quotations omitted)).)[14]  This strained interpretation of the legal standard lacks merit, and Defendant offers no supporting authority.  The first inquiry examines the quality of the affected activity and asks whether it is "sufficiently basic to the livelihood of the nation," such as a common calling.  *Friedman*, 487 U.S. at 64.  There is no requirement that a plaintiff make a quantitative showing of substantial *in*equality at the first step.

In a similar vein, Defendant next argues that Plaintiffs must demonstrate at step one that nonresident fishermen have been excluded from participating in commercial fishing in California, citing *McBurney*, 133 S. Ct. at 1715, and *Andrews*, 831 F.2d at 846.[15]  At oral argument, Defendant

---

[14] Defendant also argues that the step one inquiry varies between what it terms "tax cases" and "common calling cases."  According to Defendant, in tax cases, any distinction in income or property taxes between residents and nonresidents fails the first step of the inquiry, whereas in "common calling" or livelihood cases, the question of "substantial equality of treatment" is part of the first step inquiry.  However, case law does not support the existence of a different test for the Clause based upon the right asserted.  *See, e.g., Austin v. N.H.*, 420 U.S. 656, 663-666 (1975) (drawing no distinction between so-called "tax" and "common calling" cases; discussing *Ward v. Md.*, 79 U.S. 418 (1870) (higher nonresident license fee to trade goods); *Toomer*, 334 U.S. at 396 (higher nonresident commercial shrimping fee); *Travelers' Ins. Co. v. Conn.*, 185 U.S. 364 (1902) (tax on value of stock in local insurance corporations calculated differently for residents and nonresidents); *Shaffer v. Carter*, 252 U.S. 37 (1920) (tax on income derived from local property and business); and *Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60 (1920) (tax system which granted personal exemptions for residents)).

[15] According to Defendant, the differentials have not resulted in nonresident exclusion, as evidenced by the fact that the percentage of nonresident commercial fishing licenses and permits in California has risen over time.  (*See* Carriker Decl. ¶¶ 9-27.)  Such a connection is overly simplistic, as the number of nonresident licenses and permits says nothing about the number of potential nonresidents who may have been deterred from commercially fishing in California due to higher nonresident fees.

16

United States District Court

For the Northern District of California

1    conceded that *McBurney* contains no explicit language that supports the existence of the standard

2    they urge this court to adopt.  Rather, Defendant invites the court to infer such a requirement from

3    the *McBurney* Court's citation of three cases – *Hicklin*, 437 U.S. at 524; *Toomer*, 334 U.S. at 395;

4    and *Camden*, 465 U.S. at 221.

5          In *McBurney*, the Supreme Court's most recent Privileges and Immunities Clause case,

6    plaintiff challenged Virginia's Freedom of Information Act ("VA FOIA"), which provides that all

7    state public records are open to inspection and copying, but limits the scope of the statute to Virginia

8    citizens.  *McBurney*, 133 S. Ct. at 1714-15.  Plaintiff, a nonresident proprietor of a business that

9    "request[ed] real estate tax records on clients' behalf from state and local governments" across the

10   country, challenged the VA FOIA as violative of the Clause, arguing that it abridged his ability to

11   earn a living; "namely, obtaining property records from state and local governments on behalf of

12   clients." *Id.* at 1715.  The Court held that the VA FOIA did not come within the purview of the

13   Clause, finding that the statute "differ[ed] sharply" from the statutes at issue in *Hicklin*, *Toomer*, and

14   *Camden*.[16]  *Id.*  In each of those cases, "the clear aim of the statute at issue was to advantage in-state

15   workers and commercial interests at the expense of their out-of-state counterparts." *Id.*  In contrast,

16   the VA FOIA had only the "incidental effect of preventing citizens of other States from making a

17   profit by trading on information contained in state records." *Id.* at 1716.  The *McBurney* Court held

18   that "[w]hile the Clause forbids a State from intentionally giving its own citizens a competitive

19   _____

20   Further, there is no evidence before the court that the number of nonresident licenses and permits
21   actually correlates with the number of nonresidents actively participating in the fisheries.  For example,
     both the herring and Dungeness crab fisheries are subject to a limited entry system; if a nonresident fails
22   to renew a permit one year, he or she may not be able to obtain a permit in the future.  This may
     encourage  "place holder" permit renewals even if a nonresident does not intend to commercially fish
23   for herring or Dungeness crab in California due to higher costs.  Carriker's declaration regarding
     percentages of nonresident licenses, registrations, and permits over time is the only evidence Defendant
24   submitted in support of its argument that nonresidents have not been excluded from commercial fishing
     in California.  (*See* Def.'s Mot. 13-14.)

25        [16] In *Hicklin*, the court struck down a statute containing an Alaska resident hiring preference for
26   employment relating to the state's oil and gas resources, and in *Toomer*, the court struck down a
     differential commercial shrimping fee that had a "virtually exclusionary" effect on nonresident
27   shrimpers. *Hicklin*, 437 U.S. at 533-34; *Toomer*, 334 U.S. at 396-97.  In *Camden*, the Court held that
     an ordinance requiring that at least 40% of jobs on city-funded construction projects be held by city
28   residents "facially burdened out-of-state citizens' ability to pursue a common calling." *McBurney*, 133
     S. Ct. at 1715 (discussing *Camden*, 465 U.S. at 221-22).

United States District Court

For the Northern District of California

1  advantage in business or employment, the Clause does not require that a State tailor its every action

2  to avoid any incidental effect on out-of-state tradesmen." *Id*. at 1716.

3       Because the statutes challenged in the three cases cited in *McBurney* resulted in some

4  exclusion of nonresidents from engaging in a common calling, Defendant posits that Plaintiffs must

5  present some evidence of exclusion at the first step. Defendant's tortured interpretation overstates

6  *McBurney*. As was the case in *Toomer*, the statutes at issue here directly affect commercial fishing;

7  the fee differentials are not "incidental" to that common calling.

8       Moreover, Defendant's "exclusion" requirement runs counter to the fundamental principle of

9  the Clause, which is "to place the citizens of each State upon the same footing with citizens of other

10  States, so far as the advantages resulting from citizenship in those States are concerned" in order to

11  "strongly . . . constitute the citizens of the United States one people." *Lunding v. N.Y. Tax Appeals*

12  *Tribunal*, 522 U.S. 287, 296 (1998) (quotation marks omitted) (quoting *Paul v. Va.*, 8 Wall. 168, 180

13  (1868)); *see also Toomer*, 334 U.S. at 396 (noting that "one of the privileges which the clause

14  guarantees to citizens of State A is that of doing business in State B on terms of substantial equality

15  with the citizens of that state."). Defendant's "exclusion" test turns this principle on its head, for

16  such a requirement would lead to the result that it would be constitutionally permissible to require

17  citizens of State B to do business in State A on terms of substantial *in*equality, as long as State A

18  does not drive them out of the state.

19       Contrary to Defendant's argument, *McBurney* supports Plaintiffs' position, for it makes clear

20  that the court should consider legislative history as part of its analysis.[17] The legislative history of

21  the challenged fee differentials suggests that California targeted nonresidents for higher fees in order

22  to close budget gaps, rather than to address any burdens specifically attributable to them. With

23

24       [17] Defendant asserts that legislative history "is rarely, if ever, relevant to a Privileges and

25  Immunities Clause claim," arguing that instead, the court must focus on "the practical effect of the
   challenged law." (Def.'s Mot. 37-38.) However, in concluding that the VA FOIA statute did not

26  abridge the plaintiff's "ability to engage in a common calling in the sense prohibited by [the Clause],"
   *McBurney* noted that other laws had been struck down as violating the privilege of pursuing a common

27  calling where they had been *"enacted for the protectionist purpose* of burdening out-of-state citizens."
   133 S. Ct. at 1715 (emphasis added). Legislative intent is thus relevant to the Privileges and Immunities

28  inquiry. *See also Lunding*, 522 U.S. at 308-09 (examining the purported rationale for challenged tax
   provision); *Piper*, 470 U.S. at 285 (discussing purported and possible reasons for challenged rule).

**United States District Court**
For the Northern District of California

respect to the Dungeness crab fishery, it appears that the state targeted nonresidents for explicitly protectionist reasons.  (*See, e.g.*, Corr. Gross Decl. Exs. 185, 191.)  California's fee differentials are similar to statutes that courts have found to "discriminate[] against a protected privilege."  *Camden*, 465 U.S. at 222; *see also McBurney*, 133 S. Ct. at 1715 (discussing purposes and effects of the statutes at issue in *Hicklin*, *Toomer*, and *Camden*); *Tangier Sound*, 4 F.3d at 266-67 (holding that differential commercial fishing fees purportedly enacted to recover nonresidents' share of resource management expenses restrict a "protected privilege").

Defendant also cites *Andrews*, 831 F.2d at 846, to support his argument that Plaintiffs must demonstrate that nonresidents have been excluded from participating in commercial fishing.  In *Andrews*, the challenged statute provided for cost of living adjustments to Alaska residents working for the Alaska Marine Highway System ("AMHS"); nonresident AMHS workers were not eligible for the adjustments.  *Id*. at 844-45.  The Ninth Circuit held that the Clause did not apply because the plaintiffs "[had] not shown that they [were] prevented or discouraged by the State from pursuing employment with AMHS," noting that the statute did not "limit the number of nonresident workers, favor the hiring of Alaskan workers, or make employment with AMHS unprofitable for nonresidents."  *Id*. at 846 (citations omitted).

It appears that *Andrews*, decided in 1987, is no longer valid to the extent that it suggests that the Clause is violated only upon a showing that non-residents have been excluded as a result of a discriminatory law that affects a common calling.  The following year, in *Friedman*, the Supreme Court rejected a state's contention that bar admission on motion was not a privilege protected by the Clause because nonresidents had alternative means to bar membership in the state.  487 U.S. at 65-66.  The *Friedman* Court noted that "[n]othing in our precedents . . . supports the contention that the Privileges and Immunities Clause does not reach a State's discrimination against nonresidents when such discrimination does not result in their total exclusion from the State."  *Id*. at 66.  Indeed, the decision contains no discussion of the extent of any exclusion caused by the bar admission rules at issue.

Further, the Ninth Circuit's most recent Privileges and Immunities Clause decision, *Molasky-Arman*, contains no discussion at all – at either step of the inquiry – of the extent to which the

challenged law's increased burden on nonresidents led to any deterrence or exclusion.  In that case, the Nevada law at issue precluded nonresident insurance agents and brokers "from finalizing insurance contracts without the countersignature of a resident agent."  *Molasky-Arman*, 522 F.3d at 934.  At the step one inquiry, the court found the "ability of licensed nonresident agents and brokers to ply their trade in Nevada on substantially equal terms with resident agents falls within the purview" of the Clause.  *Id*.  The Ninth Circuit's conclusion was consistent with the requirement that courts focus on the activity burdened in Privileges and Immunities Clause cases, not the extent to which the activity is burdened.  *See Friedman*, 487 U.S. at 67 (noting that at the first step, "[t]he issue . . . is whether the State has burdened the right to practice law, a privilege protected by the Privileges and Immunities Clause, by discriminating among otherwise equally qualified applicants solely on the basis of citizenship or residency.").

Defendant's final argument at the first step of the Privileges and Immunities Clause inquiry relies on a contorted reading of *Camden*.  In *Camden*, the Court described the issue at step one as "an out-of-state resident's interest in employment on public works contracts in another State," instead of simply identifying employment (or common calling) as the burdened activity.  465 U.S. at 218.  Defendant latches on to this wording to argue that in cases where privileges involve state-funded benefits, the court must frame the step one inquiry by examining the interest at stake – here, a nonresident commercial fishermen's interest in an equal subsidy to utilize California's state-funded commercial fisheries.  This reads too much into *Camden*.  The Court described the step one issue in this manner because it distinguished public employment as "qualitatively different" from private sector employment, and noted that "[p]ublic employment . . . is a subspecies of the broader opportunity to pursue a common calling."  *Id*. (reiterating that "there is no fundamental right to government employment for purposes of the Equal Protection Clause); *see also Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265, 270 (3d Cir. 1994) (holding that "direct public employment is not a privilege or fundamental right protected by the Privileges and Immunities Clause").  In *Camden*, the Court ultimately concluded that the "opportunity to seek employment with . . . private employers is 'sufficiently basic to the livelihood of the Nation' as to fall within the purview of the Privileges and Immunities Clause," even though the private employers were

contractors working on city-funded projects.  465 U.S. at 221-22 (citation omitted).  Public employment is not at issue in this case.

In sum, Defendant's arguments that the differential fees do not fall within the purview of the Clause are not persuasive.  Commercial fishing, the activity directly affected by California's differential fees, involves the right to earn a living, "one of the most fundamental of those privileges protected by the Clause."  *See Camden*, 465 U.S. at 219.  In addition to *Toomer* and *Tangier Sound*, other cases have reached the same result specifically concerning commercial fishing.  *See Mullaney v. Anderson*, 342 U.S. 415, 416-17 (1952) (higher license fee for nonresident commercial fishermen); *Blumenthal v. Crotty*, 346 F.3d 84, 96 (2d Cir. 2003) (limitation of certain lobster fishing grounds to residents); *Carlson v. Alaska*, 798 P.2d 1269, 1274 (Alaska 1990) (higher commercial fishing license fees for nonresidents).  Therefore, California's differential commercial fishing fees "may be called to account under the Privileges and Immunities Clause."  *See Camden*, 465 U.S. at 221.

### 2. Whether the Restriction is Closely Related to the Advancement of a Substantial State Interest

At the second step of the Privileges and Immunities Clause inquiry, Defendant must show that the differential fees are "closely related to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65 (citing *Piper*, 470 U.S. at 284).

The Ninth Circuit's articulation of this standard suggests that the state can only satisfy this test by demonstrating that the differential statute targets a specific burden caused by non-residents: "a 'substantial reason' for discrimination *does not exist* 'unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed.'"  *Molasky-Arman*, 522 F.3d at 934 (quoting *Toomer*, 334 U.S. at 398) (emphasis added).[18]  The circumstances of *Molasky-Arman* gave no cause for the Ninth Circuit to explore whether a state can satisfy the second-step inquiry by identifying a substantial reason that is not tied to a specific burden caused by

_____

[18] Defendant argues that the "peculiar source of evil" formulation of the second step inquiry "appears to be falling out of favor," (Def.'s Mot. 30 n.22), as the Supreme Court did not mention it in *Friedman* and *Piper*.  The Supreme Court has never repudiated the standard, and it remains good law in the Ninth Circuit.  *See Molasky-Arman*, 522 F.3d at 934.

nonresidents.  Other cases suggest that a state has a cognizable substantial interest in recouping a fair share of the state's investment or natural resources that are being used by nonresidents, even if they are not causing an identifiable burden.

In *Tangier Sound*, the state purportedly enacted differential commercial fishing fees in order to recover the nonresidents' share of the state's resource management expenses.  4 F.3d at 267.  Without deciding whether the state had in fact asserted a "substantial state interest," the court noted that the "rationale of *Toomer* permits a state to make judgments resulting in discrimination against nonresidents . . . and . . . evenly or approximately evenly distributes the costs imposed on residents and nonresidents to support those programs benefitting both groups."  *Id*.; *see also Toomer*, 334 U.S. at 399 (holding that a state may "charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay.").  In *Carlson*, the Alaska Supreme Court considered the constitutionality of that state's commercial fishing license fee differentials, which the state justified on grounds that it sought to have nonresidents "pay a part of their fair share of the costs of enforcement, management and conservation of the fisheries."  798 P.2d at 1273.  The court held that "where residents pay proportionately more by way of foregone benefits than nonresidents for fisheries management, nonresidents may be charged higher fees to make up the difference," noting that "[t]he point of *Toomer* . . . is that the state may equalize the economic burden of fisheries management."  *Id*. at 1278.

Here, Defendant asserts three state interests which he claims justify the imposition of higher fees for nonresidents.  The first two are closely related: California's interest in recovering a reasonable share of its investment in its fisheries, and California's interest in minimizing the subsidization of nonresidents.  Defendant also identifies California's interest in maintaining its own natural resources.  *See* Cal. Fish & Game Code § 7050 (declaring legislative finding that "the Pacific Ocean and its rich marine living resources are of great environmental, economic, aesthetic, recreational, educational, scientific, nutritional, social, and historic importance to the people of

United States District Court

For the Northern District of California

1   California."). With respect to the "peculiar source of evil" formulation of the standard, Defendant

2   argues that the "evil" posed by nonresidents is their potential to obtain a free ride.[19]

3       Defendant's argument at the second step of the constitutional inquiry boils down to the

4   following. The fee differentials are closely related to the advancement of California's interests

5   because the state can require nonresidents to pay their "fair share" of the costs of enforcing,

6   managing, and conserving its fisheries. California invests substantial funds in its commercial

7   fisheries. The revenue collected through license fees does not cover that investment, resulting in a

8   shortfall. According to Defendant, California may seek reimbursement from nonresidents to cover a

9   "fair share" of that shortfall. Defendant further contends that California's fee differentials are

10  constitutionally permissible as long as they meet two limitations: the nonresident fee differentials

11  cannot 1) overcompensate the state for nonresidents' share of the state's investment, or 2) result in

12  the exclusion of nonresidents from commercial fishing.

13      Defendant relies on the following facts to demonstrate that the differentials meet its two

14  articulated constitutional limitations. First, Defendant estimates that California invests at least $12-

15  14 million each year, after revenues, in its commercial fisheries. (Def.'s Mot. 10; Carriker Decl. ¶¶

16  46-49; Warrington Decl. ¶ 91.) This $12-14 million annual shortfall between costs and revenues

17  constitutes the "value of the subsidy or State-funded benefit provided through DFG alone to all

18  commercial fishermen operating in California." (Def.'s Mot. 10.) In the three most recent license

19  years, nonresidents made up over 11% of licensed commercial fishermen in California. (Carriker

20  Decl. ¶¶ 13-15.) Therefore, applying a conservative 10% figure for nonresident participation to the

21  minimum annual estimate of $12 million in investment, nonresidents' share of the state's investment

22  in its fisheries is $1.2 million. (*See* Def.'s Mot. 32.) According to Defendant, the average amount of

23  total differentials paid by nonresidents in the last six years is approximately $391,000, or 33% of

24

25      [19] In this litigation, Defendant identified an added burden on California's commercial fisheries
    by nonresidents in the form of time spent by DFG communicating with nonresidents regarding fisheries
26  rules and procedures and obtaining information from other agencies regarding out-of-state boat
    registries. (Corr. Gross Decl. Ex. 275 (Yaremko Dep., Jan. 16, 2013), 65-69, 71.) However, this is
27  purely anecdotal; Defendant conceded that DFG has never quantified these purported higher costs
    caused by nonresidents, (H'rg Tr. July 12, 2013, 34:25-35:10), nor has it ever attempted to quantify the
28  burdens on the commercial fisheries, in general or on individual fisheries, caused by nonresidents. (Tr.
    39:8-14.)

United States District Court

For the Northern District of California

their $1.2 million share of the state's investment.  (*See* Trabucchi Decl., Apr. 10, 2013, p. 8, Table 2, Exs. T-2, T-3 (six-year average of differentials collected for each fee); *see also* H'rg Tr. July 12, 2013, 46:15-20.)  Defendant contends that the state does not overcompensate itself because the total amount of annual collected fee differentials (approximately $400,000) is far less than the non-residents' share of the state's annual investment in its commercial fisheries ($1.2 million).  (Def.'s Mot. 32.)  Moreover, Defendant argues that the differentials have not resulted in exclusion of nonresidents from participation in California's commercial fisheries.  (*See* n.15, *supra.*)  Therefore, according to Defendant, the differential fees are constitutional because they do not result in overcompensation of the state's subsidy of nonresidents, or exclusion of nonresidents.[20]

There are significant problems with Defendant's analysis.  First and foremost, Defendant's argument fails to compare the treatment of nonresident commercial fishermen with their California resident counterparts.  By so doing, Defendant ignores the question at the heart of the Privileges and Immunities Clause: whether nonresident commercial fishermen are able to do business in California "on terms of substantial equality" with California residents.  *See Toomer*, 334 U.S. at 396. Defendant's approach – to analyze the amount of nonresident fee differentials in reference to nonresidents' share of the state's investment, without comparison to the treatment of residents – contradicts basic Privileges and Immunities Clause jurisprudence.  The court *must* compare the burden on residents and nonresidents, for the Clause "was designed 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'"  *Friedman*, 487 U.S. at 64 (quoting *Paul*, 8 Wall. at 180); *see also McBurney*, 133 S. Ct. at 1716 (noting that the Privileges and Immunities Clause "forbids a State from intentionally giving its own citizens a competitive advantage in business or employment."); *Carlson*, 798 P.2d at 1278 (holding that "[t]he point of *Toomer* . . . is that the state may equalize the economic burden of fisheries management").

---

[20] It bears noting that Defendant created these two limits himself; no case law supports this articulation of his proposed constitutional boundaries.

Using Defendant's same analysis but applying it to residents as well as nonresidents results in the following comparative analysis[21]: according to Defendant, nonresidents' share of the state's $12 million investment is $1.2 million.  Therefore, residents' share of the investment is $10.8 million.  According to Defendant's data, the average total amount of annual fees for the four disputed items paid by residents in the last six years was approximately $1.65 million, or 15% of their $10.8 million share of the state's investment.  (*See* Ex. T-3 to Trabucchi Decl. (six-year average of revenues collected from residents).)  In comparison, nonresidents paid an annual average of $391,000 in differentials, or 33% of their $1.2 million share of the state's investment.  Thus, from a comparative perspective, non-resident commercial fishermen pay more than double of what their resident competitors pay toward covering their share of the shortfall in the state's investment.  Contrary to Defendant's characterization, this is not a "fair share."

Moreover, using Defendant's reasoning, it would be constitutionally permissible for California to charge nonresidents any higher amount in fees – double, triple, or ten fold what is charged to their California competitors – as long as the differentials do not overcompensate California for the nonresident share of its investment and do not exclude nonresidents.  This ignores the requirement that a state must demonstrate that a discriminating restriction "bears a close or substantial relationship" to a substantial state interest, a requirement that the Court has never abandoned.  *See Piper*, 470 U.S. at 284.  A court may find that a restriction is not closely related to a substantial state interest if there exist "less restrictive means" to achieve the objective.  *Id.*  By its own terms, Defendant's assertion that it can charge nonresidents far more than it charges residents, subject only to two broad limits, fails the "less restrictive means" test.

---

[21] By using Defendant's approach but extending it into a comparative analysis, the court does not endorse its legitimacy.  In fact, Defendant's approach may well be flawed.  To begin with, in determining how much nonresidents pay toward their "share" of California's investment, Defendant's analysis credits nonresidents solely with the amount of differentials that they pay, rather than their total fees (i.e., the base fees that everyone must pay, plus the differential amount that only nonresidents pay).  This has the effect of understating the nonresident contribution, which in turn makes it appear that the percentage nonresidents pay toward their share of the state's investment is lower, and therefore closer, to the percentage share paid by residents.  Defendant's approach also appears mathematically flawed in another way.  Defendant calculated California's investment shortfall by subtracting commercial fishing revenues (including total resident and nonresident fees) from total expenditures.  Defendant then examines the amount of differentials paid by nonresidents – but this is an amount that Defendant has already taken into account in deriving the shortfall figure.

United States District Court
For the Northern District of California

To the extent that Defendant must demonstrate that "non-citizens constitute a peculiar source of the evil at which the statute is aimed,'" *Molasky-Arman*, 522 F.3d at 934, Defendant has failed to do so.  At oral argument, Defendant explained that in the years the legislature enacted the differentials, DFG faced budget shortfalls because it was spending more on its commercial fisheries than it was collecting from commercial fishing licenses, permits, and taxes.  Therefore, the state turned to fee differentials in an effort to spread the burden of the shortfalls and to recover a portion of its investment in its commercial fisheries from nonresidents.  (Tr. 34:8-15.)  However, there is no evidence that lawmakers considered nonresidents a particular source of any budget shortfall.  Indeed, Defendant conceded that there is no record evidence 1) that California conducted any analysis of nonresidents' impact on its commercial fisheries; 2) that the differentials compensate California for any added burden on its commercial fisheries or expenses caused by non-residents; or 3) that California has identified any savings that it would realize if nonresidents were excluded from participating in commercial fishing in California.  (Tr. 38:15-41:2.)

Defendant argues that where a state's investment in natural resources is at issue, a comparison of the amounts paid by residents and nonresidents is irrelevant and unnecessary, citing *McBurney* and *Hicklin*.  Defendant reads *McBurney* to stand for the proposition that because "'the essential and patently unobjectionable purpose of state government [is] to serve the citizens of the State," a state "[may] deny out-of-state citizens a benefit that it has conferred on its own citizens." *McBurney*, 133 S. Ct. at 1720 (citation omitted).  In other words, Defendant contends that it is constitutionally permissible for a state to subsidize its residents at a greater level than nonresidents, regardless of whether this results in substantial inequality of treatment with respect to a common calling.  To begin with, the language quoted by Defendant is from *McBurney*'s discussion of the Commerce Clause, and has no bearing on the Privileges and Immunities Clause analysis.  Moreover, *McBurney* does not support Defendant's position.  There, the Court unequivocally stated that the Privileges and Immunities Clause "forbids a State from intentionally giving its own citizens a competitive advantage in business or employment." *Id*. at 1716.  A license fee that is two to three times less expensive than what nonresidents have to pay for the same license is undeniably a "competitive advantage."

United States District Court

For the Northern District of California

In *Hicklin*, Alaska contended that because it owned the oil and gas that were the subject of the "Alaska Hire" statute at issue, "this ownership, of itself, [was] sufficient justification for the Act's discrimination against nonresidents."  437 U.S. at 528.  The Court disagreed, noting that "'the States' interest in regulating and controlling those things they claim to 'own' . . . is by no means absolute.'"  *Id*. at 528-29 (quoting *Baldwin*, 436 U.S. at 385).  Instead, "a State's ownership of the property with which the statute is concerned is a factor – although often *the crucial factor* – to be considered in evaluating whether the statute's discrimination against noncitizens violates the Clause."  *Id*. at 529 (emphasis added).  Defendant argues that *Hicklin* supports his argument that as long as California does not overcompensate itself and does not exclude nonresidents from participating in its fisheries, it may charge nonresidents any amount for commercial fishing fees because it owns the natural resources at issue.  While the Court has never clarified what it meant by describing a state's ownership of property as "the crucial factor," no cases support that California's ownership of its commercial fisheries gives it the right to provide preferential treatment to its residents with respect to the use of that resource.  Under *Toomer*, a state may seek fair compensation from nonresidents for its investments in natural resources.  *Toomer*, 334 U.S. at 398-99 ("[t]he State is not without power . . . to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay.");  *see also Mullaney*, 342 U.S. at 417.  However, the object of the higher fee charged to nonresidents must be to "place the burden so that it will bear as nearly as possible equally upon [residents and nonresidents]."  *Travelers' Ins. Co. v. Conn.*, 185 U.S. 364, 368-69, 372 (1902) (holding constitutional tax on local insurance corporations calculated differently for residents and nonresidents where purpose of method "was to approximate a general equality in the burden" for state's expenses).  As the Third Circuit noted in *Tangier Sound*,

> [t]he rationale of *Toomer* permits a state to make judgments resulting in discrimination against nonresidents where the state establishes an 'advancement of a substantial state interest' as a reason for the disparate treatment, and in the facts of this case, *evenly or approximately evenly* distributes the costs imposed on residents and nonresidents to support those programs benefiting both groups.

4 F.3d at 267 (emphasis added).  By deeming a state's ownership of the resource as "the crucial factor," the Court appeared to acknowledge that a state may treat nonresidents differently in order to

recover a portion of its investment in its natural resources.  Harmonizing this principle with the Court's Privileges and Immunities Clause jurisprudence, a state must do so in a way that fulfills the Clause's goal of substantial equality of treatment of residents and nonresidents.  Defendant offers no facts to support that the state has done so.

In sum, as Defendant has failed to meet its burden to show the existence of a genuine dispute of fact regarding whether its differential fees are closely related to a substantial state interest, summary judgment must therefore be granted to Plaintiffs.

### B.    Equal Protection Clause

Because the court concludes that the differential fees violate the Clause, it need not reach Defendant's arguments that he is entitled to summary judgment on Plaintiffs' equal protection claim.

### VII.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is denied.  Plaintiffs' motion for summary judgment is granted.

Plaintiffs seek declaratory and injunctive relief in this matter.  (4th Am. Compl. (prayer).) The parties shall meet and confer as to the form of a proposed judgment and shall jointly submit a proposed judgment within fourteen days of the date of this order.  If the parties are unable to agree, Plaintiffs shall submit a proposed judgment within fourteen days of the date of this order.  Any objections to the proposed judgment by Defendant are due within seven days of Plaintiffs' filing.

This order disposes of Docket Nos. 201, 205, 215, 216, 218, 219, and 227.


IT IS SO ORDERED.


Dated: October 16, 2013



DONNA M. RYU
United States Magistrate Judge